# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 17-1747V
UNPUBLISHED

| | |
|---|---|
| LARRY NELSON,<br><br>        Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>        Respondent. | Chief Special Master Corcoran<br><br>Filed: January 13, 2021<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Guillain-Barré Syndrome (GBS) |

*Randall G. Knutson*, Knutson & Casey Law Firm, Mankato, MN, for Petitioner.

*Naseem Kourosh*, U.S. Department of Justice, Washington, DC, for Respondent.

**DECISION AWARDING DAMAGES**[1]

On November 7, 2017, Larry Nelson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered Guillain Barré syndrome ("GBS") as a result of receiving the influenza ("flu") vaccination on September 20, 2016. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters, and although Respondent conceded entitlement, the parties could not informally resolve damages.

For the reasons set forth below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount **$166,700.04**, representing

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**$155,000.00** for actual pain and suffering, **$4,339.00** for past unreimbursed medical expenses, and **$7,361.04** for future expenses.

### I.      Relevant Procedural History

Approximately 11 months after this case was initiated, Respondent filed a Rule 4(c) Report on September 27, 2018, conceding that Petitioner was entitled to compensation. ECF No. 26. A ruling on entitlement was issued on the same day. ECF No. 27. The parties thereafter attempted to informally resolve damages but were unsuccessful. ECF No. 62. A scheduling order was issued on August 14, 2020 (ECF No. 63), regarding the briefing of disputed damages issues, and the parties filed their respective briefs (ECF Nos. 64-66 ("Br."), 67 ("Opp."), and 68 ("Resp.")). I proposed that the parties be given the opportunity to argue their positions at a motions hearing, at which time I would decide the disputed damages issues. ECF. No. 69. That hearing was held on December 11, 2020,[3] and the case is now ripe for a determination.

### II.     Relevant Medical History

A complete recitation of the facts can be found in the Petition, the medical records, the parties' pre-hearing briefs, and in Respondent's Rule 4(c) Report. In brief summary, Mr. Nelson was 63 years old when he received a flu vaccine on September 20, 2016, in Willmar, Minnesota[4]. His prior medical condition included restless leg syndrome, chronic L5 radiculopathy, lumbar spinal fusion, REM sleep behavior disorder, anxiety and depression. Ex. 13 at 1-5, 21. Mr. Nelson continued to have chronic daily back pain, but it was considered to be well controlled. Ex. 4 at 4.

On October 21, 2016, Mr. Nelson presented to JoLene Schlegel, R.N. ("NP"), at his primary care physician's office complaining of numbness in both feet, left greater than right, which "started on Monday." Ex. 4 at 8. A neurological exam showed bilaterally decreased upper and lower extremity sensation, normal cranial nerve function, and normal DTRs. *Id*. at 10. NP Schlegel diagnosed bilateral arm and leg numbness and tingling possibly related to his fall, and she recommended follow-up in a week if symptoms did not resolve. *Id*. at 8. Routine lab testing at that visit showed a normal CBC and chemistry panel. *Id*. at 25-26.

---

[3] At the end of the hearing held on December 11, 2020, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed with the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

[4] Mr. Nelson also received a polysaccharide pneumococcal vaccine (brand name Pneumovax) on that date. Ex. 4 at 1. The polysaccharide pneumococcal vaccine is not covered by the Vaccine Act.

Mr. Nelson returned to see Dr. Mulder on October 21 and 24 with progressing sensory symptoms and weakness, and GBS was considered. Ex. 4 at 14-20. On October 31, 2016, Petitioner presented to the Fairview Northland Medical Center emergency room, reporting the onset of progressive weakness and numbness two weeks earlier with symptoms first affecting his left hand and spreading to his left foot, right hand, and right foot. Ex. 5 at 2. The numbness was now spreading up his legs, and he was unable to walk. *Id*. He also reported problems with breathing and swallowing. *Id*. Mr. Nelson was transferred to the University of Minnesota-Fairview Medical Center with a diagnosis of GBS. *Id.* at 4-5.

Mr. Nelson received five days of IVIG and improved. Ex. 6 at 52. His hospital course was remarkable for leukopenia (low white blood cells), which the hematologist thought was due to the IVIG. *Id*. at 16-17. Mr. Nelson was transferred to an inpatient acute rehabilitation facility on November 8, 2016. Ex. 6 at 52. At that time, he was ambulating with a walker. *Id*. at 58. Petitioner was discharged home on November 10, 2016, to continue with physical and occupational therapy on an outpatient basis. *Id*. at 52-57.

By November 14, 2016, Mr. Nelson was walking independently with a walking stick. Ex. 7 at 2. His neurologist, Lyla K. Veen, M.D., noted that his strength was almost back to normal, although he continued to have some numbness in his extremities. *Id*. Dr. Veen recommended that Petitioner continue with outpatient physical therapy and occupational therapy. He continued this therapy until January 5, 2017 and was instructed to continue on a home exercise program. Ex. 6 at 52-57.

Mr. Nelson saw Dr. Veen again in follow-up on February 1 and March 29, 2017. Ex. 7 at 5-17. Petitioner reported an apparent recurrence of symptoms at the February visit, including increased paresthesias in his hands and feet and achy legs. *Id*. at 5. It showed some mild abnormalities of uncertain clinical significance, and the results were not considered to be the residual effects of GBS. *Id*. On March 29, 2017, Dr. Veen noted that she was "confident that he has overcome" his GBS, but he may have some residual parasthesias long term, and she prescribed gabapentin. *Id*. at 16.

Dr. Veen also noted that based on recent MRIs of the cervical and lumbar spine, Mr. Nelson had neck and back pain attributable to degenerative vertebral and disc changes, and she referred him to physical therapy and a neurosurgeon. Ex. 7 at 16. On May 2, 2017, Mr. Nelson saw Dr. Mardi Oswald of Metropolitan Neurosurgery for evaluation of "years of neck pain," which was mostly on the right side and sometimes radiated down his right arm. Ex. 10 at 2. Mr. Nelson reported that gabapentin was helping a little bit with his hand paresthesias from GBS. *Id.* On exam, he had normal extremity strength and sensation but diffusely diminished DTRs. *Id.* He was diagnosed with a

possible right C6 radiculopathy secondary to foraminal stenosis at C5-6. *Id.* Dr. Oswald recommended an epidural steroid injection and physical therapy. *Id.*

Mr. Nelson continued to seek treatment for neck pain over the ensuing months. *See generally* Exs. 18 and 20. He underwent surgical intervention, and on December 27, 2017, Joel C. Shobe, M.D., of St. Cloud Orthopedic Associate performed an anterior cervical discectomy and fusion, C5-C6, with allograft and plating, to treat right C5-C6 disk herniation with foraminal stenosis. Ex. 20 at 7-8. In follow-up on March 28, 2018, Mr. Nelson was "doing quite well, noting further improvement in his neck pain and arm pain symptoms. He still feels some stiffness in his neck." *Id.* at 14. Dr. Shobe noted that Mr. Nelson had normal strength in all muscle groups of the lower extremities. *Id.* He instructed Petitioner on performing home exercises and recommended follow-up in about three months. *Id.*

Mr. Nelson saw Dr. Veen for follow-up on July 17, 2018, reporting that he "has had no recurrence of GBS symptoms." Ex. 22 at 1. On examination, he had normal strength and DTRs were present throughout. He had somewhat diminished sensation in a stocking glove pattern which was "improved from previous." *Id.* at 2. Dr. Veen noted that Mr. Nelson was "experiencing some recurrence of symptoms, albeit very mild," but concluded that "his current presentation does not seem to be related to GBS." *Id.* at 3-4. A repeat EMG on July 25, 2018 showed "very mild" right median neuropathy at the wrist and "very mild" chronic right C8 radiculopathy with "no evidence of large fiber polyneuropathy, including no signs of demyelination." *Id.* at 6. He returned to Dr. Veen for follow-up on September 13, 2018, April 19, 2019, and November 18, 2019, and his condition was stable. Ex. 27 at 2-9, 16-20.

In his affidavit, Mr. Nelson describes the degree to which he is experiencing residual symptoms, including that he continues to suffer from neuropathy in his fingers, unsteadiness, and generalized joint weakness. ECF No. 66. He explains that this has had a direct impact on his daily activities because he currently lives in the Philippines (due in part to the COVID-19 travel ban) and is unable to fulfill his duties around a farm. *Id.* Mr. Nelson details in his affidavit that his GBS and resulting symptoms have affected his anxiety and depression issues, in additional to his physical limitations.

### III. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury,

and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in a specific case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may also rely on my own experience adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### IV. Appropriate Compensation in this Matter

#### A. Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times, Mr. Nelson was a competent adult with no impairments that would impact his

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

awareness of his injury. Therefore, I analyze principally the severity and duration of petitioner's injury.

Mr. Nelson's medical records and his affidavit provide a description of the pain he experienced throughout the duration of his injury, and which he deemed significant. Br. at 8-14. Petitioner cites to a number of damages decisions involving GBS injuries and highlights the similarities between the petitioners in those cases and GBS. *Id*. Petitioner therefore submits that a damages award in amount greater than $150,000.00 for past pain and suffering is appropriate in this case. *Id*. at 13-14.[6]

Respondent, on the other hand, argues that while Mr. Nelson has continued to complain of neurological symptoms, "his treating neurologist has repeatedly stated that, with the possible exception of paresthesia for which petitioner is taking gabapentin, these are not related to his GBS." Opp. at 8. Respondent notes that Mr. Nelson underwent cervical fusion surgery in December 2017, and that much of his subsequent medical treatment has been associated with that injury. *Id*. By July 2019, an EMG demonstrated "very mild" right median neuropathy at the wrist and "very mild" chronic right C8 radiculopathy, but "no evidence of larger fiber polyneuropathy, including no signs of demyelination," reflecting a good recovery from GBS. *Id.* Respondent also notes that Mr. Nelson's overall recovery was faster and more complete than those in the previous cases cited in his brief, since such claimants had ongoing symptoms related to GBS that were documented in the medical records. *Id*. at 8-9. As a result, Respondent proposes an award of $110,000.00 to be an appropriate pain and suffering award given the facts of this case when compared with other, more severely injured petitioners. Opp. at 9.

After reviewing the record in this case and considering the parties' arguments during the hearing, I find that the record best supports the conclusion that Petitioner's condition, while serious, was on the mild end of severity of GBS cases. In addition, Mr. Nelson had other ailments and conditions that are likely contributing to some of his symptoms, including his cervical radiculopathy, for which he underwent an anterior cervical discectomy and fusion surgery. Ex. 20 at 7-8. These conditions surely contributed to his neck and arm pain symptoms. At the same time, subsequent treaters have expressly noted that Petitioner's GBS-related symptoms did not recur. *See,* e.g., Ex. 22 at 1.

I also find the comparable damages determinations from other cases offered by Petitioner to be inapt. In such cases, where pain and suffering awards ranged from

---

[6] In particular, Petitioner cited to *Johnson v. Sec'y of HHS*, No. 16-135V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $180,000.00 for pain and suffering); *Dillenbeck v. Sec'y of HHS*, 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) (awarding $180,857.15 for pain and suffering); *Fedewa v. Sec'y of HHS*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. March 26, 2020) (awarding $180,000 for pain and suffering).

$170,000.00 to $180,000.00, the injured parties experienced far worse prognoses subsequent to the initial hospitalizations and could no longer work or was out of work for several months, attended far more PT visits, and continued to require medication for pain specifically related to the GBS. *See Johnson* 2018 WL 5024012, at *7-8; *Dillenbeck* 2019 WL 4072069, at *14; *Fedewa* 2020 WL 1915138, at *6. Here, by contrast, Petitioner's recovery was much quicker, nor does the record indicate that he has experienced long-lasting treatments or deficiencies specifically related to his GBS. Ex. 5 at 52; Ex. 7 at 6. In fact, Mr. Nelson's neurologist specifically stated that she believed that Mr. Nelson had made a good recovery from his GBS. For these reasons, I cannot find that the GBS injury and its sequelae were of such high severity to justify an award of the magnitude requested by Petitioner.

Nevertheless, GBS is a serious and frightening vaccine injury, and Petitioner's pain and suffering award should be calculated with that in mind. Prior to vaccination, Mr. Nelson was active and relatively healthy, which likely contributed his eventual recovery, but also underscores the impact his illness had on his life. While in the hospital, Mr. Nelson developed leukopenia (low white blood cells) resulting from the IVIG treatments Ex. 6 at 53. He endured several months of physical and occupational therapy. During the months following his GBS diagnosis, Petitioner also suffered a loss of enjoyment of activities in which he once participated. Although he could ambulate independently, he required the use of a walking cane. Additionally, Petitioner's leg weakness caused him to suffer multiple falls and bruising. Ex. 5 at 2. For these reasons, I find that Respondent's recommendation of $110,000.00 is far too modest.

Balancing the severity of a GBS injury and Petitioner's personal loss against the relatively low severity of disease course and treatment requirements, and considering the arguments presented by both parties at the hearing, a review of the cited cases, and based on the record as a whole, I find that **$155,000.00** in compensation for actual/past pain and suffering is reasonable and appropriate in this case.

### B. Past Unreimbursed Expenses

The parties agree that Petitioner shall receive an award of $4,339.00 for his past unreimbursable expenses.

### C. Award for Future Unreimbursed Medical Expenses

The parties agree that Petitioner shall receive an award of $7,361.04 for his future medical unreimbursable expenses.

## V.    CONCLUSION

In light of all of the above, I award **Petitioner a lump sum payment of $166,700.04**, (representing compensation in the amount of $155,000.00 for actual pain and suffering, $4,339.00 for past unreimbursed medical expenses, and $7,361.04 for future reimbursed expenses) **in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this decision.[7]

**IT IS SO ORDERED.**

                                                **s/Brian H. Corcoran**
                                                Brian H. Corcoran
                                                Chief Special Master

---

[7] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.